[No. B169470. Second Dist., Div. Five. Mar. 16, 2005.]

MARY ROBBINS et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

654

**COUNSEL**

Law Offices of Tabone and Derek L. Tabone for Plaintiffs and Appellants.

Cynthia Vroom; Lewis Brisbois Bisgaard & Smith, Alan R. Zuckerman and William Archer for Defendants and Respondents.

**OPINION**

**MOSK, J.—**

## INTRODUCTION

■ Plaintiffs and appellants Mary Robbins, individually (Mary), and Mary Robbins as guardian ad litem for both Carl Robbins (Carl) and Andy Robbins (Andy)[1] appeal from a judgment in favor of defendants and respondents the Regents of the University of California (The Regents) (erroneously sued as Cooperative Extension, University of California) and Rachel Surls (Surls). The primary issue presented in this appeal is whether the administrator of the 4-H program in Los Angeles County violated the federal constitutional right to free speech (U.S. Const., 1st Amend.) of two 4-H club members and an adult "community leader" of the club when the administrator suspended them while she investigated whether the members, who participated in making a film depicting violent behavior, posed a risk of violent

---

[1] We refer to plaintiffs by their first names for ease of reference, and not out of disrespect.

behavior. In light of the Ninth Circuit's decision in *LaVine v. Blaine School Dist.* (9th Cir. 2001) 257 F.3d 981 (*LaVine*), in which the court held there was no federal constitutional violation under similar circumstances, we affirm the judgment in favor of defendants. In addition, we affirm the award of attorney fees to defendants.

## BACKGROUND

4-H is the youth education branch of the Cooperative Extension Service, a program of the United States Department of Agriculture. The purpose of the 4-H program is "to assist children in developing as community leaders and involving themselves in community-based action in positive ways." In California, the 4-H program is part of the University of California Division of Agricultural and Natural Resources (ANR), and is administered by the University of California's Cooperative Extension. Surls is the County Director of the University of California Cooperative Extension for Los Angeles County. As county director, Surls is responsible for administration of, among other programs, the 4-H program in Los Angeles County.

In 2001 and 2002, several members of a 4-H club in Los Angeles County, known as the Eastside Kids 4-H Club (the Club), participated in a filmmaking project. The members, working with an adult advisor, wrote, acted in, and filmed a video in which two teenagers, who had been picked on and teased by other teenagers, go to a party attended by the other teenagers and kill them with machete-type knives. Carl and Andy, who were high school students and members of the Club, participated in the filmmaking project; their mother, Mary, who was a "community leader" of the Club, had no involvement in the project. The members submitted the video to the San Fernando Valley Fair for judging.

In early June, 2002,[2] the Board of the San Fernando Valley Fair (Board) notified 4-H that some 4-H members had submitted a video that the Board refused to judge due to the video's violent content. The Board released a copy of the video to Surls on June 6. After viewing the video, Surls became concerned that the 4-H members who made the video may be risks for committing actual violent behavior, and she arranged a conference call on June 7 with four other ANR officials to discuss her concerns. The other officials concurred that immediate action had to be taken given the violent nature of the video.

On June 10, Surls wrote to the members involved in the project, the adult project leader, and two adult "community leaders" of the Club, notifying them that they were suspended pending an investigation into the making of

---

[2] Further references to dates are to the year 2002 unless otherwise specified.

the video. That investigation included interviewing those members who agreed to be interviewed, consulting with a psychologist who specializes in workplace and youth violence (and who had consulted on the highly publicized Columbine school shooting of April 1999 in Littleton, Colorado, and other cases), and consulting with the juvenile division of the local police department. The interviews with the involved members began the week of June 10, and by July 2, the suspensions of all members who came forward to be interviewed had been lifted.

Carl and Andy did not come forward to be interviewed before July 2. Instead, on June 21, Mary filed the complaint in this action alleging on behalf of herself and Carl and Andy a cause of action for injunctive and monetary relief under section 1983 of title 42 of the United States Code (section 1983) on the ground that The Regents violated their rights to freedom of expression, freedom of association, and due process under the federal Constitution.[3] (U.S. Const., 1st, 5th, & 14th Amends.) On that same day, Mary individually and on behalf of Carl and Andy brought an ex parte application for a temporary restraining order and a preliminary injunction. The trial court continued the hearing on the ex parte application to July 2, at which time it denied the application, stating, "I am not persuaded that the plaintiffs will win this lawsuit. In fact, I am persuaded that the plaintiffs are likely to lose the lawsuit." On July 10, Carl and Andy were interviewed as part of the investigation, and their suspensions were lifted. Mary's suspension was lifted on July 19.

On October 4, the trial court sustained The Regents' demurrer to the complaint on the ground that The Regents is not a "person" and thus is not subject to a claim for relief under section 1983. Surls, who remained as a defendant, filed a motion for summary judgment on October 31, to be heard on January 17, 2003, in which she asserted that the complaint fails as a matter of law because she is entitled to qualified immunity. The motion was supported by Surls's declaration, in which Surls described how she learned of the filmmaking project, what actions she took after viewing the video, and her reasons for taking those actions. Five weeks after the motion was served, plaintiffs served a notice to take Surls's deposition on December 18. On December 10, Surls objected to the notice and refused to appear at the deposition, on the ground that she was entitled to have her qualified immunity defense determined before she had to submit to discovery. Plaintiffs did not move to compel Surls to appear. Instead, on January 6, 2003, plaintiffs filed with their opposition to Surls's summary judgment motion an objection to Surls's declaration, on the ground that Surls refused to appear at her deposition. Plaintiffs also purported to dispute most of the facts set forth in

---

[3] At the time the complaint was filed, the only defendant was The Regents (erroneously sued as Cooperative Extension, University of California). Surls was added as a defendant on July 12.

Surls's separate statement of undisputed facts in support of the motion, based solely on their objection to Surls's declaration. Plaintiffs did not cite to any evidence to raise disputed issues with regard to the facts set forth in Surls's separate statement.

The summary judgment motion was heard on April 25, 2003, after numerous continuances, at which time the trial court overruled all of plaintiffs' objections to Surls's declaration and granted Surls's motion, finding there was "no evidence of [a] violation of any constitutional right." The trial court entered judgment in favor of defendants, and defendants moved under section 1988 of title 42 of the United States Code (section 1988) for the attorney fees they incurred after plaintiffs' motion for a preliminary injunction was denied and Carl's and Andy's suspensions were lifted. The court granted the motion and awarded Surls and The Regents fees in the amount of $5,404. Plaintiffs appeal from the judgment and the order awarding attorney fees.

## DISCUSSION

### A. *Plaintiffs' Objection to Surls's Declaration*

Plaintiffs contend they were denied due process when the trial court overruled their objection to Surls's declaration and considered the declaration in granting Surls's summary judgment motion, because plaintiffs were denied an opportunity to test by discovery the evidence presented against them. Plaintiffs forfeited this assertion of error.

■ The Code of Civil Procedure provides that a plaintiff may serve a notice of deposition on a defendant who has appeared in the action, and if the defendant fails to appear, the plaintiff may move to compel the defendant to appear for deposition. (Code Civ. Proc., § 2025, subds. (b)(2), (j)(3).)[4] The Code of Civil Procedure also provides that a party opposing a summary judgment motion may file an application to continue the motion to obtain discovery necessary to oppose it. (§ 437c, subd. (h).)

■ During the four months that elapsed between Surls's refusal to appear for deposition and the hearing on Surls's summary judgment motion, plaintiffs did not move to compel Surls to appear for her deposition or move for a continuance of the summary judgment motion for the purpose of conducting further discovery. Plaintiffs do not offer any explanation for their failure to move to compel or to move for a continuance for further discovery. Because they "did not take advantage of opportunities to avoid in

---

[4] As of July 1, 2005, Code of Civil Procedure sections 2025.210, subdivision (b), 2025.450. Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

the trial court the problem about which they now complain on appeal, they have [forfeited] any claim of a due process violation." (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828 [97 Cal.Rptr.2d 226]; see also *Zamudio v. City and County of San Francisco* (1999) 70 Cal.App.4th 445, 454 [82 Cal.Rptr.2d 664].)

### B. *Propriety of Summary Judgment*

Surls sought summary judgment on the ground that, as a government official, she was entitled to qualified immunity from plaintiffs' claim against her. (See *Harlow v. Fitzgerald* (1982) 457 U.S. 800, 806 [73 L.Ed.2d 396, 102 S.Ct. 2727] [government officials are entitled to some form of immunity—either absolute or qualified—from suits for damages].) The trial court agreed that Surls was entitled to immunity, finding there was no evidence of a constitutional violation (and even if there was such a violation, it was not one of clearly established law), by virtue of *LaVine, supra,* 257 F.3d 981, a case the trial court found was "virtually indistinguishable" from the present case. Plaintiffs contend the summary judgment was improper (1) because qualified immunity does not bar actions for injunctive relief, and their complaint sought injunctive relief as well as damages, and (2) because there were triable issues of fact precluding summary judgment on the basis of qualified immunity. Because we hold the undisputed facts establish there was no constitutional violation as a matter of law—and thus no basis for injunctive relief under section 1983—we need not address whether qualified immunity precludes plaintiffs' claim for injunctive relief.

### 1. *Standard of Review*

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], italics and fns. omitted.) If the moving party carries that burden, the burden of production shifts to the opposing party to make a prima facie showing of the existence of a triable issue of material fact. (*Ibid.*) On appeal from a summary judgment, we make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

## 2. *Analysis*

▮ The United States Supreme Court has instructed that "[a] court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right? . . . [¶] . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow [government officials] to avoid the burden of trial if qualified immunity is applicable." (*Saucier v. Katz* (2001) 533 U.S. 194, 201 [150 L.Ed.2d 272, 121 S.Ct. 2151].)

In the present case, the answer to the threshold question is "No"—the facts plaintiffs allege do not show that Surls's conduct violated their constitutional rights. Although the answer is the same regardless of which plaintiff is at issue (that is, Mary in her individual capacity, or Mary as guardian ad litem of Carl and Andy), the analysis differs depending upon the identity of the plaintiff.

Plaintiffs allege that Surls punished Mary, Carl, and Andy for exercising their constitutional right to free speech—i.e., creating a video as part of a filmmaking project—by suspending them from participation in 4-H activities.[5] But plaintiffs admit in their opening brief on appeal that Mary "had no part in the [filmmaking] project." Thus, plaintiffs admit that if Surls punished Mary at all, the punishment was unrelated to any speech or other expressive act *by Mary*. Accordingly, the section 1983 claim alleged on behalf of Mary in her individual capacity does not allege a violation of Mary's constitutional right to free speech.

Although there is no dispute that Carl and Andy participated in making the video, and that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments" to the federal Constitution (*Joseph Burstyn, Inc. v. Wilson* (1952) 343

---

[5] Although the complaint alleged violations of the federal constitutional rights to free speech, freedom of association, and due process, plaintiffs limit their argument on appeal to an alleged violation of the right to free speech under the First Amendment to the United States Constitution. Accordingly, plaintiffs have abandoned their claims based upon alleged violations of the right to freedom of association or due process. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)

U.S. 495, 502 [96 L.Ed. 1098, 72 S.Ct. 777]), it does not follow that, in the context of this case, Surls violated Carl's and Andy's free speech rights when she suspended them while she investigated the making of the video.

■ To determine whether Surls violated Carl's and Andy's free speech rights, we must determine what those rights are. We are guided in this determination by the Ninth Circuit's decision in *LaVine, supra,* 257 F.3d 981, a case in which a high school temporarily expelled a student after the student wrote a violent poem, while the school determined whether the student posed a threat to the safety of himself or others at the school. The Ninth Circuit began its analysis by noting that "we live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shootings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kinds of tragedies." (*Id.* at p. 987.) The court explained, however, that "the Constitution sets limits as to how far [schools] can go . . . [and that schools must] achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights." (*Ibid.*)[6]

■ The Ninth Circuit examined the line of United States Supreme Court cases defining the scope of students' First Amendment right to free speech. The court explained that under those cases, the students' First Amendment rights " ' "are not automatically coextensive with the rights of adults in other settings" ' and must be ' "applied in light of the special characteristics of the school environment." ' " (*LaVine, supra,* 257 F.3d at p. 988, quoting *Hazelwood Sch. Dist. v. Kuhlmeier* (1988) 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562] (*Hazelwood*); *Bethel Sch. Dist. No. 403 v. Fraser* (1986) 478 U.S. 675 [92 L.Ed.2d 549, 106 S.Ct. 3159] (*Fraser*); and *Tinker v.*

---

[6] The California Supreme Court recently commented on this need to balance the schools' interest in protecting the safety of their students and the students' constitutional right to freedom of expression in a case involving the prosecution of a student for criminal threats arising from a poem the student had written. (*In re George T.* (2004) 33 Cal.4th 620 [16 Cal.Rptr.3d 61, 93 P.3d 1007].) The Supreme Court explained, "This case implicates two apparently competing interests: a school administration's interest in ensuring the safety of its students and faculty versus students' right to engage in creative expression. Following Columbine, Santee, and other notorious school shootings, there is a heightened sensitivity on school campuses to latent signs that a student may undertake to bring guns to school and embark on a shooting rampage. Such signs may include violence-laden student writings. For example, the two student killers in Columbine had written poems for their English classes containing 'extremely violent imagery.' [Citation.] Ensuring a safe school environment and protecting freedom of expression, however, are not necessarily antagonistic goals." (*Id.* at p. 639.) Although the court held that the student's poem did not constitute a criminal threat, it noted, "[c]ertainly, school personnel were amply justified in taking action" after they were notified about the violent content of the student's poem. (*Ibid.*) The court explained, however, that that issue was not before it. (*Ibid.*)

*Des Moines Indep. Cmty. Sch. Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733] (*Tinker*).) The court identified three different kinds of student speech, "each of which is governed by different Supreme Court precedent: [¶] (1) vulgar, lewd, obscene and plainly offensive speech is governed by *Fraser*; [¶] (2) school-sponsored speech is governed by *Hazelwood*; and [¶] (3) speech that falls into neither of these categories is governed by *Tinker*." (*LaVine, supra*, 257 F.3d at pp. 988–989.)

██ Finding that the student's speech at issue fell into the third category, the Ninth Circuit explained that, under *Tinker, supra*, 393 U.S. 503, "school officials must justify their decision [to temporarily expel the student] by showing 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.' " (*LaVine, supra*, 257 F.3d at p. 989.) The court listed several facts that supported the school's decision, but the court found the "most important[]" fact was the student's poem itself. (*Id.* at p. 990.) The poem was "filled with imagery of violent death and suicide. At its extreme it can be interpreted as a portent of future violence, of the shooting of James' fellow students. Even in its most mild interpretation, the poem appears to be a 'cry for help' from a troubled teenager contemplating suicide. Taken together and given the backdrop of actual school shootings, we hold that these circumstances were sufficient to have led school authorities reasonably to forecast substantial disruption of or material interference with school activities—specifically, that James was intending to inflict injury upon himself or others." (*Ibid.*) The court noted that the school allowed the student to return to school as soon as he was evaluated by a psychiatrist and found not to be a threat to himself or others, and thus, the court held that the school did not violate the First Amendment by temporarily expelling the student. (*Ibid.*)

In the present case, as in *LaVine, supra*, 257 F.3d 981, the person who made the decision to temporarily suspend plaintiffs was shown an expressive work of art—in *LaVine* it was a poem, and here it was a video—that raised concerns about the possibility of future violence. Here, as in *LaVine*, that person suspended plaintiffs for a short period of time while she conducted an investigation to determine whether plaintiffs and the other participants in the filmmaking project were a threat to others. Under the reasoning set forth in *LaVine*, this temporary suspension did not violate plaintiffs' First Amendment rights.

Plaintiffs argue, however, that *LaVine, supra*, 257 F.3d 981, does not apply because (1) *LaVine* was decided in the context of a school environment, unlike this case involving a 4-H club; (2) there were other facts that supported the school's decision in *LaVine*, but no such facts exist here; (3) the school in *LaVine* had a written policy regarding discipline, and 4-H did

not have such a policy; and (4) the court had read the poem at issue in *LaVine*, but the trial court in this case had not viewed the video. These differences between *LaVine* and the present case, however, do not warrant a different conclusion regarding whether there was a First Amendment violation.

Although a 4-H club is not a school, it is an educational program for school children, administered by the University of California. The primary concern described in *LaVine, supra,* 257 F.3d 981—the safety of other students attending school—is equally present in a 4-H club, where school children regularly meet for educational purposes. Thus, the 4-H club in this case is the functional equivalent of the school in *LaVine*. And even though the school's decision in *LaVine* was supported by facts in addition to the content of the poem itself, the Ninth Circuit found the content of the poem to be the most important fact, particularly in light of recent school shootings involving "telltale 'warning signs' " (*id.* at p. 987) of future violence.

Although it is true that the trial court in the present case had not viewed the video at issue, there was no dispute as to its content. Moreover, the trial court gave plaintiffs an opportunity to provide a copy of the video and offered to stop the hearing on the summary judgment motion to view the video if plaintiffs believed it was necessary, but plaintiffs did not provide a copy to the court or request the court to view the video.

Finally, the fact that the school in *LaVine* had a written disciplinary policy was not a factor in the Ninth Circuit's holding that there was no First Amendment violation. Instead, the court found that the actions the school took in deciding to temporarily expel the student show that the school was not trying to discipline him but was instead seeking to protect its students from potential violence. (*LaVine, supra,* 257 F.3d at p. 991.) Similarly, in this case, it appears from the actions that Surls took when she learned of the video, and the fact that she reinstated the members after they were interviewed and determined not to pose a safety threat, Surls's purpose was to protect the other members of the Club rather than to discipline the members involved in the filmmaking project.

Because the trial court correctly found there was no First Amendment violation in the present case, no further inquiry into qualified immunity was required. Therefore, the court did not err in granting summary judgment in favor of Surls.

### C. *Award of Attorney Fees*

The trial court awarded defendants the attorney fees they incurred after the court denied plaintiffs' motion for a preliminary injunction and plaintiffs'

suspensions were lifted, finding that plaintiffs' continued prosecution of the lawsuit was unreasonable and that therefore defendants were entitled to attorney fees under section 1988. Plaintiffs challenge the award of attorney fees, arguing that their lawsuit was neither frivolous nor prosecuted in bad faith.

Section 1988 provides, in relevant part, "In any action or proceeding to enforce a provision of section[] . . . 1983, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." (42 U.S.C. § 1988(b).) The United States Supreme Court has imposed a limitation, however, on the trial court's discretion to award fees when the prevailing party is a defendant. In such cases, the court may award fees only if it finds that the plaintiff's " 'claim was frivolous, unreasonable, or groundless, *or that the plaintiff continued to litigate after it clearly became so.*' " (*Hughes v. Rowe* (1980) 449 U.S. 5, 15 [66 L.Ed.2d 163, 101 S.Ct. 173], italics added.) We review the trial court's award of attorney fees under section 1988 for an abuse of discretion. (*McFadden v. Villa* (2001) 93 Cal.App.4th 235, 237 [113 Cal.Rptr.2d 80]; *Franceschi v. Schwartz* (9th Cir. 1995) 57 F.3d 828, 830.)

In the present case, the trial court found that the law supporting the summary judgment "is really pretty clear" and that plaintiffs continued to litigate their claim even though "the activity complained of by the plaintiffs was remedied in whole or in part pretty quickly." Plaintiffs dispute the trial court's assessment that the law supporting the judgment was clear, noting that the "extensive briefs," "lengthy arguments," delays in ruling on the summary judgment motion, and the trial court's extensive discussion of its rationale for granting the summary judgment demonstrate that their claim was not so utterly devoid of merit as to justify attorney fees. But as the trial court explained at the hearing on the attorney fee motion, "while it is clear that at times the amount of attention that a court gives to an issue can be evidence of its bona fides, I'm not sure that's true in this department. I take a lot of time on a lot of things because I care about giving people respect and giving them a hearing. [¶] Therefore, I don't automatically assume that the amount of time I spend on an issue is an [*sic*] evidence of its viability as an issue."

We agree with the trial court that in light of *LaVine, supra,* 257 F.3d 981, plaintiffs' assertion of a violation of their First Amendment right to free speech was unreasonable and that plaintiffs' continued prosecution of their claim after their suspensions were lifted was likewise unreasonable. Therefore, the trial court did not abuse its discretion in awarding defendants their attorney fees.

## DISPOSITION

The judgment and order granting attorney fees are affirmed. Defendants shall recover their costs on appeal.

Armstrong, Acting P. J., and Kriegler, J.,[*] concurred.

---

[*]Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.