Filed 5/22/13  Neal v. County of Shasta CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| TERESA NEAL, | C066720 |
| Plaintiff and Appellant, | (Super. Ct. No. 166096) |
| v. | |
| COUNTY OF SHASTA et al., | |
| Defendants and Respondents. | |

Plaintiff and appellant Teresa Neal claims her civil rights were violated and her personal property taken when defendant County of Shasta's (County) sheriff deputies and SWAT team executed an arrest warrant at her home for Jess David Woods, with whom Neal owned the home.  All of plaintiff's claims were brought pursuant to the federal civil rights act (42 U.S.C. § 1983; hereafter section 1983).  After hearing plaintiff's evidence, the trial court granted defendants' motion for nonsuit.

Plaintiff's appeal argues the trial court erred in granting nonsuit.  She argues defendants violated her federal Fourth Amendment rights when they searched her home incident to the arrest of Woods, because Woods was arrested before the search, making a continued search warrantless.  Plaintiff's version of the order of events is mere wishful

1

thinking, as all the evidence indicated the arrest of Woods occurred simultaneous to the sweep search of the home, and Woods was not conclusively identified until after the sweep search was completed. Citing federal authority that is contrary to California state authority, plaintiff argues the County had no Eleventh Amendment immunity for the law enforcement actions of its sheriff's department. The California Supreme Court has held otherwise, and we are bound by its authority.

Plaintiff argues she presented circumstantial evidence that was sufficient to hold two law enforcement officers personally liable for taking her property when she testified that her jewelry was in her home when she left for work in the morning, and missing after the SWAT team and sheriff's department concluded their search. Plaintiff presented no evidence that either or both individuals took her property, and unless she can show personal participation in the deprivation of her property, she cannot hold either of the individual defendants personally liable for violating her constitutional rights. Moreover, because she has an adequate postdeprivation remedy under the California Tort Claims Act (Gov. Code, §§ 810-895), she is precluded from recovering under section 1983.

Finally, plaintiff argues the trial court abused its discretion when it awarded defendants attorney fees as the prevailing party in a section 1983 action.

We shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On March 20, 2008, the United States Marshals Service (U.S. Marshals) contacted the Shasta County Sheriff's Department regarding a warrant for the arrest of Woods, who was wanted for a 1993 murder committed in Indiana.[1] The U.S. Marshals wanted the assistance of the sheriff's department in serving the warrant.

---

[1] Woods was subsequently convicted of the murder.

Defendant Jeff Foster, then a Lieutenant in the sheriff's department, received the call in the morning. The officers were briefed that there might be a female at the property. At the briefing, the officers were told that Woods was suspected of being the triggerman in a murder-for-hire, that he was directly associated with an outlaw motorcycle gang, that he had violent contacts with law enforcement, and that he had a violent criminal history that included weapons and bombs. Based on this information, the decision was made to coordinate the effort to serve the warrant with the sheriff's department's SWAT team. The warrant authorized the officers to enter the premises, buildings, and vehicles to arrest Woods.

Defendant Craig Tippings, a sheriff's deputy, was sent to reconnoiter around Woods's residence. The residence was a doublewide mobilehome. Approximately 30 to 45 minutes before the arrest team arrived, Deputy Tippings informed them that there was a man outside the residence who possibly matched the description of Woods. He did not know for certain that the person he saw was Woods, however.

The arrest team arrived at Woods's residence in a caravan of vehicles that included a van containing the SWAT team. The SWAT team entered the mobilehome at approximately the same time other officers went around to the back of the mobilehome where Woods was apprehended. The SWAT team made a brief, initial search throughout the mobilehome, then a secondary search to make sure no one was hiding inside. Both searches were for the purpose of securing the officers' safety. Neither search involved searching areas where a person could not hide. Although Woods was apprehended substantially simultaneously with the SWAT team entry into the mobilehome, there was no positive identification of Woods until the SWAT team was finished and ready to leave.

Testimony of Deputy Tippings

Deputy Tippings was in the car leading the caravan of officers and SWAT team members to Woods's residence. He parked his car on the east side of the residence, ran

3

toward the back of the mobilehome, and hid behind a tree. He estimated it took him 20 seconds from the time he left his car to come within view of the shed behind the mobilehome. During this time he heard the front door of the mobilehome being breached, and one or two flashbang devices being deployed.[2] When he first spotted Woods near a shed, Woods had his hands up, and was eventually taken into custody without a struggle. Deputy Tippings searched the shed and found a semiautomatic weapon on a shelf to the right of the door.

Deputy Tippings entered the residence just as the members of the SWAT team were finishing their sweep of the mobilehome. He estimated they had been in the mobilehome only five minutes before he entered. He observed several firearms in plain view.[3] He entered the bedroom with Detective Christopher McQuillan. There was a shotgun leaning against the wall. He also observed three marijuana plants. Deputy Tippings did not stay in the mobilehome long, but stepped out onto the porch. As he did so, the SWAT team was leaving. Deputy Tippings secured the mobilehome, and no one was left inside. When Detective McQuillan, who had been dispatched to Redding to obtain a search warrant, informed Deputy Tippings that the warrant had been issued, he re-entered the mobilehome with the U.S. Marshals. Deputy Tippings did not enter the mobilehome any other time, and did not allow anyone else to enter the premises. Deputy Tippings did not perform the search pursuant to the second search warrant. The U.S. Marshals performed the search, and Deputy Tippings carried the weapons out of the mobilehome and took photographs.

---

**2** A flashbang is an explosive diversion device.

**3** There were 22 firearms in all, consisting of four revolvers, eight semiautomatic pistols, two other pistols, five semiautomatic rifles (including an AK-47), a semiautomatic shotgun, a single-shot shotgun, and a bolt action rifle.

Deputy Tippings eventually took possession of all the property taken from the second search and delivered it to the evidence locker.

Lieutenant Foster's Testimony

Lieutenant Foster pulled up to Woods's residence. As he approached the north side of the property, he could hear the SWAT team announcing their presence at the front door of the residence. Shortly thereafter, Lieutenant Foster saw Woods exiting the rear of the residence, apparently in an attempt to get away from the SWAT team that was coming in the front of the residence. Lieutenant Foster did not then know that the subject was Woods. He saw something dark in Woods's right hand, which Lieutenant Foster believed to be a gun. Lieutenant Foster commanded Woods to drop his weapon. Woods did not immediately respond, but hesitated, looked right and left, then stepped partially into a shed. Lieutenant Foster commanded Woods to stop moving. Lieutenant Foster remembered hearing a flashbang go off in the residence after he told Woods to stop, but before Woods was subdued. Within a minute after Woods was handcuffed, the SWAT team advised Lieutenant Foster that the residence was secure and clear. Approximately three to four minutes after Woods was handcuffed, the officers were able to identify him. When the shed was subsequently searched, a loaded semiautomatic handgun was found where Woods had been.

Before Lieutenant Foster entered the residence, he was briefed on what the SWAT team had discovered. They told him they had located several weapons stations at the entry and exit doors and by the windows. At the earlier briefing and again on the scene, the U.S. Marshals advised Lieutenant Foster that the gun they believed Woods had used to commit the murder in Indiana was still outstanding. Because of this and because of the multiple weapons being in the residence of a felon, the decision was made to obtain another warrant to search the premises. Lieutenant Foster was in the mobilehome for approximately three to five minutes after being briefed by the SWAT team, and was at the property a total of 15 minutes.

5

<u>Detective McQuillan's Testimony</u>

Detective McQuillan received a call from Lieutenant Foster on the day of Woods's arrest requesting his assistance with writing a search warrant, commonly referred to as a *Ramey*[4] warrant, for the arrest of Woods at his residence in Whitmore. Detective McQuillan was not informed prior to preparing the *Ramey* warrant that Woods was in possession of any weapons or that there were any associates at the property. He was provided with Woods's criminal history, which included possession of explosive devices and assault weapons.

When Detective McQuillan arrived at the residence, the SWAT team and the U.S. Marshals were outside the residence. He entered the residence by the back door and inspected inside. His inspection was for the purpose of writing a second warrant. When he left, the SWAT team was still there. He went back to Redding to obtain the second warrant, which was signed at 4:10 p.m. When he arrived back at the residence around 5:00 p.m., plaintiff was there and was being interviewed by Deputy Tippings.

Detective McQuillan entered the mobilehome and looked at the three marijuana plants, but did not enter any other rooms. The only person he saw in the mobilehome was Deputy Tippings. Detective McQuillan did not personally take possession of any property or inventory the property, but he did sign the return of the second warrant.

<u>Plaintiff's Testimony</u>

Plaintiff arrived while the officers were waiting for the second warrant. Plaintiff testified she had numerous items of jewelry that were in her home when she left for work in the morning and gone after the search. Plaintiff submitted a handwritten list of over 24 pieces of missing jewelry made of gold, diamonds, and gems.

---

**4**     *People v. Ramey* (1976) 16 Cal.3d 263.

Plaintiff's original complaint named as defendants the County, Tom Bosenko individually and as the Sheriff of Shasta County, Christopher McQuillan, Larry Fitch, Jeff Foster, Craig Tippings, and Steven Berg.  All individually named defendants were sued both individually and in their capacity as law enforcement officers for the sheriff's department.  Plaintiff alleged against all defendants a federal civil rights violation pursuant to section 1983, a state civil rights violation, and negligence.  Plaintiff dismissed all individual defendants except McQuillan, Foster, and Tippings, and also dismissed the state civil rights and negligence causes of action.  This leaves for our consideration, a section 1983 action against the County and McQuillan, Foster, and Tippings, both individually and as officers in the sheriff's department.  However, plaintiff does not assert on appeal that there was any error in the judgment with respect to defendant Foster.

## DISCUSSION

We review the grant of a motion for nonsuit de novo.  (*Fields v. State of California* (2012) 209 Cal.App.4th 1390, 1394-1395.)  We use the same standard as the trial court, i.e., we must determine as a matter of law that the evidence presented by the plaintiff is insufficient to permit a jury to find in her favor.  (*Ibid*.)  We do not weigh the evidence, but interpret all the evidence most favorable to the plaintiff's case and resolve all presumptions, inferences, and conflicts in the evidence in favor of the plaintiff.  (*Ibid*.)

### I

### Sheriff's Department is Immune from Liability

A county sheriff's department and sheriff act on behalf of the state when performing law enforcement activities, and therefore enjoy the state's immunity from prosecution for asserted violations of section 1983 when performing such functions. (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 826, 828 (*Venegas*).)  The California Supreme Court has held that the doctrine of sovereign immunity protects a county sheriff's department against causes of action under section 1983 for unreasonable

search and seizure. (*Venegas, supra,* at p. 828.) Accordingly, the trial court correctly granted nonsuit in favor of the County.

Plaintiff presents a vague argument that Eleventh Amendment immunity does not protect the County. She cites a federal Ninth Circuit case, which held that a county sheriff acts on behalf of a county, rather than the state, when performing law enforcement functions. (*Bishop Paiute Tribe v. County of Inyo* (9th Cir. 2002) 291 F.3d 549, vacated on other grounds and remanded in *Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony* (2003) 538 U.S. 701 [155 L.Ed.2d 933].) However, the California Supreme Court considered this case when it decided *Venegas* and concluded that it did not accurately reflect California law. (*Venegas*, *supra*, 32 Cal.4th at p. 830.) Whether a public official represents the state or county when acting in a particular capacity is analyzed under state rather than federal law. (*Id.* at p. 831.) The decisions of federal appellate courts are not persuasive where they are contrary to California Supreme Court authority. (*In re Bettencourt* (2007) 156 Cal.App.4th 780, 801.)

Plaintiff also cites *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611] (*Monell*), for the proposition that municipal entities may be held liable as persons. However, *Monell* held merely that local governing bodies are "included among those persons to whom [section] 1983 applies" and that they can be sued "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (*Id.* at p. 690, fn. omitted.) *Monell* itself recognized that its holding was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes." (*Id.* at p. 691, fn. 54.) Because the sheriff's department of the county is considered part of the state when performing law enforcement functions, *Monell* is not applicable here.

Plaintiff argues "[t]here are several methods of establishing municipal liability besides the final policymaker argument that Defendant's proffered in their motion."

8

Plaintiff explains that a "municipality may also be held liable for a policy custom or practice that is a de facto policy of its employees, even though the custom may not be formally adopted." This argument begs the question. An unconstitutional de facto policy of a state governmental unit that enjoys sovereign immunity by virtue of the Eleventh Amendment cannot be sued for a de facto policy any more than it can be sued for an official policy.

To the extent plaintiff contends that the remaining defendants McQuillan, Foster, and Tippings are liable for the unlawful search incident to arrest, there was no evidence presented that these defendants participated in the search. Lieutenant Foster and Deputy Tippings did not enter the mobilehome until the members of the SWAT team were finishing their sweep. Detective McQuillan did not arrive at the residence until the SWAT team had left the mobilehome.

II

Search Did Not Violate Fourth Amendment

Having determined that the county sheriff's department is immune from suit, the question remains whether the trial court properly granted nonsuit as to plaintiff's Fourth Amendment claims against the individual defendants for the search that followed the initial search incident to arrest. Plaintiff claims that all intrusions during the period between the time the arrest warrant was completed and the second search warrant was signed at 4:10 p.m. constituted a violation of her Fourth Amendment rights.

The initial search of the home was valid, and the subsequent search was justified because of the firearms in plain view that were found during the initial search. Therefore, there was no Fourth Amendment violation.

Plaintiff's argument is premised on her claim that the initial search was invalid because the officers had no right to enter the home after the arrest of Woods was completed. This argument is based on *Maryland v. Buie* (1990) 494 U.S. 325 (*Buie*) [108 L.Ed.2d 276], which held that officers may make a "limited protective sweep in

9

conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Id*. at p. 337.)

Plaintiff claims the rule of law set forth in *Buie* results in the conclusion that the search incident to arrest was unlawful because the evidence in this case indicates that the arrest was concluded *before* the SWAT team went into the mobilehome, and there were no facts indicating someone in the mobilehome was a danger to the arresting officers. However, the evidence plaintiff cites to support her claim that the sweep took place after the arrest consists entirely of inferences drawn from police reports or pleadings in another case, none of which were admitted into evidence.

Instead, the testimony of every officer indicated the entry into plaintiff's mobilehome was virtually simultaneous with the capture of Woods, and that Woods was not identified until the initial search was complete.

Lieutenant Foster testified that the SWAT team officers were at the front of the line of vehicles travelling to the residence because they were designated as going in first to secure the scene. Before Lieutenant Foster saw Woods he heard the SWAT team making their entrance at the front door. Lieutenant Foster did not see Woods immediately when he exited his car, but spotted him a few seconds thereafter. Lieutenant Foster was not sure at that time that the person he saw behind the mobilehome was Woods. When Lieutenant Foster spotted Woods, Woods was making a hasty exit from the back door of the mobilehome trying to get away from the entering SWAT team, and he appeared to be armed. Lieutenant Foster heard one flashbang device go off before Woods was in custody, as he was telling Woods to stop and drop his weapon. He heard the SWAT team moving around in the mobilehome before and during the time Woods finally dropped to the ground. Lieutenant Foster estimated he was advised the residence was secure approximately 30 seconds to a minute after Woods had been handcuffed. The officers were able to confirm Woods's identity approximately three to four minutes after

10

he was handcuffed.  The search of the mobilehome was completed long before Lieutenant Foster learned that Woods was the person in custody.

Deputy Tippings was not sure that the person he had seen outside the mobilehome was Woods.  He testified that after the caravan of law enforcement officers arrived at the residence, it took him about 20 seconds to get from his vehicle to a position from which he could see Woods.  During this time he heard the SWAT team announce their presence, go in the front of the mobilehome, and deploy one or two flashbang devices.

Deputy Steven Berg testified that he heard the flashbangs at the same time he observed Lieutenant Foster giving commands to someone at the rear of the mobilehome.  Multiple things were happening at the same time.  He did not ever recall hearing anyone say that the suspect was in custody.

Undersheriff Greg Wrigley, who eventually took Woods into custody, testified he heard the SWAT team announce their presence and enter while he was standing at the van, before he went around the side of the mobilehome.  He heard the flashbang devices go off close to the time the officers were giving Woods orders.

Sergeant Thomas Bertain, who was part of the SWAT team that entered the mobilehome, testified he never heard any officer outside giving directions to the suspect.  They had already conducted their search when the person arrested outside was identified as Woods.

Deputy Eric Magrini also was part of the SWAT team.  He testified he heard that the suspect was in custody after they finished their complete operation inside the mobilehome.  He did not hear anyone commanding the suspect while they were in the mobilehome.

Sergeant Jose Gonzalez testified he saw the team enter the mobilehome at about the same time the person was being taken into custody in the back.  The person was first identified as a male suspect at about the time the team was entering the front.  There was no indication yet that the male suspect was Woods, and they had no idea how many

11

people might be in the residence. Sometime while the SWAT team was in the process of sweeping the mobilehome, he heard that the person in back was in custody. The person was not positively identified as Woods until the search was done and they were ready to leave.

Lieutenant Foster was briefed that it was possible that there would be a female at the home. He had no information whether there were other males present at the home. Deputy Tippings was informed by the U.S. Marshals that Woods had a live-in girlfriend and that she might be in possession of firearms.

Lieutenant Foster had been briefed that Woods had previously had violent contacts with law enforcement and that he had a violent criminal history that included weapons and bombs. He considered this arrest highly dangerous.

None of the officers testified that Woods was arrested and identified before the SWAT team searched the mobilehome. There was no evidence that Woods was already in custody and identified before the SWAT team entered the mobilehome. There were, on the other hand, articulable facts indicating the need to secure the premises for the safety of the officers. These facts were that when the SWAT team entered they did not know where Woods was, or how many people were in the mobilehome. They knew that Woods's live-in girlfriend, the plaintiff in this case, might be in possession of firearms. Furthermore, they had information that Woods had a violent criminal history that included weapons and bombs. There was no evidence from which a jury could have concluded that the initial sweep search was unwarranted because Woods's arrest had been completed before the entry into the mobilehome and there was no danger to the officers posed by anyone in the mobilehome.

Once in the mobilehome the officers saw several firearms in plain sight. At that point they were authorized to seize any incriminating evidence observed in plain view. (*Horton v. California* (1990) 496 U.S. 128, 133-137 [110 L.Ed.2d 112].) The firearms also supported a finding of probable cause to issue a search warrant for the premises.

12

Probable cause is established where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548].) It is a crime for a person who has been convicted of a felony to possess a firearm or have a firearm in their possession or custody or control. (Pen. Code, § 29800.) The firearms in Woods's residence were evidence of a crime, thus constituted probable cause for the issuance of the second warrant. Consequently, the actions of the officers subsequent to discovering the firearms in plain sight during the initial sweep search did not violate plaintiff's Fourth Amendment rights.

III

No Section 1983 Claim for Missing Property

Plaintiff argues the trial court erred in ruling that there was insufficient evidence for a jury to find the individual officers Tippings or McQuillan stole her jewelry. The trial court's judgment of nonsuit found that there was no substantial evidence that any individual defendant stole anything from plaintiff. The trial court stated on the record that there was insufficient evidence to go to the jury on a theory of theft or conversion of property. It opined: "You cannot take a group of people who had the opportunity to steal something, and because you're unable to identify who the true culprit or culprits are, pick a few out and accuse them of theft."

To prove a case under section 1983, a plaintiff must demonstrate that (1) the government's action occurred under color of state law, and (2) it resulted in the deprivation of a constitutional right or federal statutory right. (*Parratt v. Taylor* (1981) 451 U.S. 527, 535 [68 L.Ed.2d 420] (*Parratt*), overruled on other grounds by *Daniels v. Williams* (1986) 474 U.S. 327 [88 L.Ed.2d 662].) "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983." (*Jones v. Williams* (9th Cir. 2002) 297 F.3d 930, 934.) Personal participation can be found if a person was either personally involved in the violation of a

13

right, or was an integral participant in the conduct giving rise to the violation. (*Macias v. County of Los Angeles* (2006) 144 Cal.App.4th 313, 323.)

Nevertheless, to hold the officers here individually liable for plaintiff's missing property, there must be some evidence from which a jury could draw a reasonable inference that the officer was personally responsible for taking the property. No such evidence was presented, and the trial court correctly determined that the jury could not draw a permissible inference of individual liability from the mere fact that the jewelry was present before the search and missing after the search.

Moreover, a defendant's random and unauthorized deprivation of a plaintiff's property does not result in a violation of procedural due process if there is an adequate state postdeprivation remedy. (*Parratt, supra*, 451 U.S. 527; *Hudson v. Palmer* (1984) 468 U.S. 517, 533 [82 L.Ed.2d 393].)

In *Parratt* an inmate alleged that prison employees negligently lost a package sent to him while he was in segregation and not allowed to receive it. (*Parratt, supra,* 451 U.S. at p. 530.) The court noted that the deprivation of property did not occur as a result of an established state procedure, but as a result of the unauthorized failure of agents to follow established procedure. (*Id*. at p. 543.) It concluded that the state (Nebraska) provided a remedy to persons who suffered a tortuous loss at the hands of the state. (*Ibid*.) These remedies were sufficient to satisfy the requirements of due process.[5] (*Id*. at p. 544.) *Hudson v. Palmer* specifically applied the holding in *Parratt* to an intentional deprivation of property effected through a random and unauthorized conduct of a state employee. (*Hudson v. Palmer, supra,* 468 U.S. 517.) Thus, neither a negligent nor an intentional deprivation of property will state a claim under section 1983 if the state has an

---

[5]     The Supreme Court later overruled *Parratt* to the extent it held that a mere lack of due care by a state official may deprive an individual of Fourteenth Amendment rights. (*Daniels v. Williams* (1986) 474 U.S. 327, 330-331 [88 L.Ed.2d 662, 668].)

adequate postdeprivation remedy. (*Hudson v. Palmer, supra,* at p. 533.) California's Tort Claims Act (Gov. Code, §§ 810-895) provides an adequate postdeprivation remedy for any property deprivation.

IV

Attorney Fees Were Properly Awarded

Title 42, section 1988, of the United States Code provides in part that a court may in its discretion allow the prevailing party reasonable attorney fees in any action to enforce a provision of section 1983. Where, as here, the prevailing party is a defendant, attorney fees are awarded only where the " 'claim was frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.' " (*Hughes v. Rowe* (1980) 449 U.S. 5, 15 [66 L.Ed.2d 163, 173].)

We review the trial court's award of attorney fees for an abuse of discretion. (*Robbins v. Regents of University of California* (2005) 127 Cal.App.4th 653, 665.) The trial court found that plaintiff's pursuit of the action was not entirely unreasonable until the completion of pretrial discovery, but that after that time the prosecution of the action was frivolous, unreasonable, and without foundation. Consequently, the trial court awarded defendant the County attorney fees in the amount of $15,525.00.

Plaintiff argues her claim was not frivolous because the "issue of when police can continue a sweep is disputed" and the trial court ignored the fact that Deputy Tippings placed the suspect in the backyard before the officers conducted their initial sweep search. Rather it is plaintiff who ignored the following facts: (1) that Deputy Tippings did not positively identify the subject he spotted as Woods, (2) that Deputy Tippings saw the person later identified as Woods some 30 to 45 minutes before the search team arrived, (3) that the person later identified as Woods was in the mobilehome when the search team arrived and was first spotted exiting the back door, and (4) that the entry of the search team into the mobilehome was virtually simultaneous with the capture of Woods, and occurred before Woods was positively identified.

15

Furthermore, there was no evidence presented to support plaintiff's version of events, i.e., that Woods was positively identified in the backyard of the mobilehome, that having been positively identified he was detained and arrested there, and that only after he was arrested did the SWAT team conduct its initial sweep search of the mobilehome.

The trial court acted well within its discretion in finding that the plaintiff continued the litigation after it clearly became frivolous, unreasonable, and without foundation.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.


                             BLEASE                , Acting P. J.


We concur:


     BUTZ                , J.


     DUARTE                , J.

16